1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

PAMELA MANSFIELD,

CASE NO. C14-0948JLR

11

Plaintiff,

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

12

v.

13

DAWN JONES PFAFF, et al.,

14

Defendants.

15

## I.   INTRODUCTION

16

Before the court are Defendants Dr. Jerry Palmer and Mara Stevens'[1] motion for

17

summary judgment (Mot. (Dkt. # 113-1)), Plaintiff Pamela Mansfield's opposition

18

thereto (Resp. (Dkt. # 119-1)), and Defendants' reply memorandum (Reply (Dkt. # 120)).

19

This is a First Amendment retaliation case.  Ms. Mansfield claims that Defendants

20

21

22

_____

[1] At the time of the events in question, Ms. Stevens was known as Mara Fletcher.  (*See* anti-SLAPP Mot. (Dkt. # 40) at 4 n.5; Stevens Decl. (Dkt. # 109) ¶ 1.)  The court refers to her throughout this order by her current name—Mara Stevens or Ms. Stevens.  (Stevens Decl. ¶ 1.)

1    terminated her employment as a research nurse with the University of Washington

2    ("UW") in retaliation for her having reported alleged improprieties in the work of Dr.

3    Palmer's research team.  (*See* 3d Am. Compl. (Dkt. # 61) ¶¶ 12, 33-35; Resp. at 3-14.)

4    She asserts that this reporting constitutes protected speech under the First Amendment.

5    (*See* 3d Am. Compl. ¶¶ 33-35; Resp. at 15-17.)  Defendants move for summary judgment

6    on three principal bases:  (1) Ms. Mansfield's speech was not protected, (2) Ms.

7    Mansfield's speech was not a substantial or motivating factor in the decision to terminate

8    her employment, and (3) UW would have terminated Ms. Mansfield's employment even

9    absent her allegedly protected speech.  (*See* Mot. at 2, 5-6.)  The court has considered the

10   submissions of the parties, the balance of the record, and the relevant law.  Being fully

11   advised,[2] the court GRANTS Defendants' motion for summary judgment and

12   DISMISSES this case WITH PREJUDICE.

13                          **II.    BACKGROUND**[3]

14        Ms. Mansfield is a registered nurse who began working for UW in 1994.  (*See* 3d

15   Am. Compl. ¶¶ 1, 10; Palmer Decl. (Dkt. # 106) ¶ 4.)  In 2007, she received an

16   appointment as a research nurse on a UW diabetes study headed by Dr. Palmer ("the

17   study").  (*See* 3d Am. Compl. ¶ 10; Palmer Decl. ¶¶ 2, 4.)  In addition to Ms. Mansfield

18

19        [2] No party has requested oral argument, and the court deems oral argument to be
20   unnecessary for the disposition of this motion.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

21        [3] Defendants ask the court to strike multiple documents and portions of documents that
     Ms. Mansfield submitted with her opposition memorandum.  (Reply at 2 n.1.)  Except as
22   specifically discussed below, the documents and passages at issue have no impact on the court's
     analysis, and therefore the court declines to consider Defendants' request at this time.

and Dr. Palmer, the research team included an administrative assistant and research

coordinator named Dawn Jones-Pfaff and several other individuals.  (*See* 3d Am. Compl.

¶¶ 4, 6, 10; Palmer Decl. ¶¶ 8-9; Jones-Pfaff Decl. (Dkt. # 28) ¶¶ 1-3.)  The primary

location of the team's work was the Veterans Administration ("VA") campus in Seattle's

Beacon Hill neighborhood.  (*See* 3d Am. Compl. ¶ 10; Brooks-Worrell Decl. (Dkt. # 31)

¶¶ 3-4; Palmer Decl. ¶¶ 2, 4; Palmer Decl. ¶ 4, at 11-12 ("Job Description") at 1.)  As

such, Ms. Mansfield required a without-compensation ("WOC") appointment with the

VA in order to perform her job duties.  (*See* Brooks-Worrell Decl. ¶¶ 3-4; Palmer Decl.

¶ 3.)

Over time, certain relationships within the team soured, particularly those between

Ms. Mansfield and both Ms. Jones-Pfaff and Dr. Palmer.  This conflict included

allegations regarding Ms. Mansfield's job performance and, as most relevant here,

allegations by Ms. Mansfield regarding Ms. Jones-Pfaff and alleged improprieties in the

Palmer team's research practices.  (*See, e.g.*, 3d Am. Compl. ¶ 12; Mansfield Decl. (Dkt.

# 117-10) 1C-1E; Brown Decl. (Dkt. # 110) ¶¶ 6, 9; Palmer Decl. ¶¶ 7-13, 16-24.)

Specifically, in late 2010, Ms. Mansfield began to exhibit concern regarding some

of the team's research practices that she viewed as unsafe, unethical, and in violation of

Institutional Review Board ("IRB") protocols for the study (hereinafter "IRB

violations").  (*See* Resp. at 2; Mansfield Decl. ¶¶ 1C-1D; Jacobson Decl. (Dkt. # 117-11)

App'x 32 ("2d Reports"), App'x 48 ("1st Report").)  Ms. Mansfield reported several such

issues to UW's Human Subjects Division ("HSD"), a division that helps to oversee UW

research projects involving human subjects.[4]  (*See* 1st Report; 2d Reports at 3-4; Moe Decl. (Dkt. # 111)  ¶¶ 2-4; *see also* Brown Decl. (Dkt. # 110) ¶¶ 2-3.)  In November 2010, Ms. Mansfield reported that Ms. Jones-Pfaff and another team member had violated informed consent and subject recruitment protocols.  (*See* 1st Report at 1-2; *see also* 2d Report at 1-2; Brown Decl. ¶ 6.)  Later, in December 2010, Ms. Mansfield reported that the team was using an unsafe needle size (*see* 2d Reports at 3; Brown Decl. ¶ 6, at 6-7), and in January 2011, she reported that the team was using an unsafe variety of syringe and allowing unlicensed personnel (Ms. Jones-Pfaff) to put heparin in a syringe and then use the syringe to draw blood (*see* 2d Reports at 4).  In April 2011, she also reported that Ms. Jones-Pfaff attempted to admit a child for an examination at an adults-only facility.  (*See* Brown Decl. ¶ 9; *see also* 2d Reports at 5.)

In her deposition testimony, Ms. Mansfield explains that her job at UW required her to report IRB violations to HSD:

> Q:  [W]as one of your job duties to ensure compliance with applicable protocols?

---

[4] In the words of HSD Director Karen Moe, HSD's functions include "receiving and investigating complaints or reports by subjects and research participants concerning human subjects research, such as complaints of non-compliance with IRB study protocols." (Moe Decl. (Dkt. # 111) ¶¶ 2-3; *see also* Brown Decl. (Dkt. # 110) ¶¶ 2-3.) When HSD receives complaints of non-compliance with IRB study protocols, HSD determines "whether any non-compliance or violation has occurred and, if so, the severity or nature of any violation," and "provides that determination to the assigned IRB." (Moe Decl. ¶ 3; *see also* Brown Decl. ¶ 3.) Ms. Mansfield often refers to her reports to HSD as having been made to an IRB or as IRB reports (*see, e.g.*, Resp. at 3); however, the reports to which she cites are reports to either Dr. Palmer or to HSD (*see id.* at 4; Mansfield Decl. ¶¶ 1C-1D (citing 1st Report; 2d Reports); *see also* Brown Decl. ¶¶ 6-10 (recounting that HSD received reports from Mansfield, investigated them, and referred the reports and investigation materials to the relevant UW IRB committee)). Accordingly, the court refers to these reports as reports to HSD.

A:  Yes, the mission of a [UW] Health and Human Services registered nurse . . . are those duties.

Q:  Including IRB protocols.  Part of your job was to ensure compliance with those?

A:  Correct.

Q:  Do you believe that you had a duty to report any IRB protocol violations?

A:  Yes.

Q:  And that was part of your job responsibilities?

A:  Correct.

. . .

Q:  So if you weren't satisfied with the response you received by a supervisor, was it your obligation to report that to, for example, [HSD]?

A:  My duties as a registered nurse are patient safety, patient privacy, validity of study outcome, and the ethical treatment.  So, yes, if I report it to my direct supervisor -- it was also my duty as an employee of [UW] to make sure that they're aware . . . .

Q:  So part of your job, from your perspective, was to report IRB protocol violations to [HSD]?

A:  My chain of command was to report it to the principal investigator, and then if I had questions, the IRB is a resource for the University and you could contact them for questions as well.  So, yes, in adherence to policies, I used those departments.

Q:  Was one of your responsibilities?

A:  Yes, one of my responsibilities.

(*See* Mansfield Dep. at 44:14-46:4; *see also id.* at 116:11-16, 167:12-14, 167:20-24.)  Ms.

Mansfield states that her status as a registered nurse also obligated her to report to HSD.

1 (*See id.* at 167:11-168:4, 418:10-17.)  She notes, however, that her written job description

2 did not mention a reporting obligation.[5]  (*See id.* 418:1-10; Mansfield Decl. ¶ 1.)  The

3 Director of HSD, Karen Moe, and HSD's Assistant Director for Quality and Compliance,

4 Wendy Brown, both attest that all UW employees involved in human subject research are

5 required to report "any ethical concern, non-compliance, or other problem" to their

6 supervisor, and if unsatisfied with the supervisor's response, to HSD or another

7 appropriate UW office.  (Moe Decl. ¶¶ 2, 5; Brown Decl. ¶¶ 2, 4; *see also* Berntsen Decl.

8 (Dkt. # 108) ¶ 12, at 89-98 ("Devine Dep.") at 37:2-6.)

9        Ms. Mansfield followed up on her reports to HSD with reports to the Washington

10 State Auditor's Office ("the Auditor").  (*See* Mansfield Decl. ¶ 1F.)  She filed a brief

11 online report with the Auditor on February 5, 2011 (*see id.*; Jacobson Decl. App'x 46

12 ("1st Auditor Report")), and then submitted a more detailed report on April 25, 2011 (*see*

13 Mansfield Decl. ¶ 1F; Jacobson Decl. App'x 31 ("2d Auditor Report")).  These reports

14 cover the allegations in Ms. Mansfield's HSD reports.  (*Compare* 1st Report *and* 2d

15 Reports *with* 1st Auditor Report *and* 2d Auditor Report.)

16 _____

17     [5] The written job description of Ms. Mansfield's "REGISTERED NURSE 2 –
RESEARCH" position states the incumbent's primary duties.  (*See* Job Description at 1-2;
18 Palmer Decl. ¶ 4.)  According to that description, the incumbent will, among other duties,
"coordinate participation of the University's clinical center in a multi-center, international
19 clinical study . . . .  The incumbent will have responsibility for day-to-day clinical activities of
the study at the University of Washington, including study and protocol development, subject
20 recruitment, *ensuring participation and adherence to study protocol*, performance of tests, and
will assist in evaluating study outcome."  (Job Description at 1 (emphasis added).)  In addition,
21 the incumbent must have the ability to "rigidly adhere to study protocol" and "take a leadership
position in the planning and implementation of this study, other studies, and supervising
22 personnel working on these studies."  (*Id.* at 2.)  The incumbent must also be a registered nurse
with a current license to practice in Washington.  (*Id.*)

1     In the meantime, the conflict between Ms. Mansfield and Ms. Jones-Pfaff came to

2  a head.  On March 9, 2011, Ms. Mansfield reported to the VA that Ms. Jones-Pfaff snuck

3  up behind her and slammed her head into a desk.  (*See* 3d Am. Compl. ¶ 19.)  The VA

4  investigated the incident and, after concluding that no assault occurred, revoked Ms.

5  Mansfield's access to its facilities.  (*See id.* ¶ 20; Gladson Decl. (Dkt. # 69); Rose Decl.

6  (Dkt. # 70); Thomas Decl. (Dkt. # 71); Berntsen Decl. ¶ 10, at 72-76 ("Keelin Report").)

7  Shortly thereafter, UW administrators recommended that human resources ("HR")

8  terminate Ms. Mansfield's employment on the basis that she could not perform her duties

9  without access to the VA facilities.  (*See* Stevens Decl. ¶¶ 2-4, at 6-13; Devine Dep. at

10  38:24-39:2).)

11     Ms. Stevens, a HR manager for UW School of Medicine, affirmed the

12  recommendation to terminate Ms. Mansfield's employment.  (*See* Stevens Decl. ¶¶ 2-4,

13  8-9, at 22; Resp. at 13-14.)  Before doing so, however, Ms. Stevens set up a meeting with

14  Ms. Mansfield, the sole purpose of which was to allow Ms. Mansfield to address the

15  asserted reason for the termination recommendation—lack of access to VA facilities.

16  (*See* Stevens Decl. ¶¶ 4-6, at 6-18; Resp. at 13.)  Roughly forty-five minutes before that

17  meeting was to begin, Ms. Mansfield's counsel sent an email to Ms. Stevens in which he

18  argued that Ms. Mansfield was the victim of a retaliatory scheme by her coworkers.  (*See*

19  *id.* ¶ 7, at 19-21 ("Jacobson Email").)[6]  Counsel's email was the first time Ms. Stevens

20

21  _____

22  [6] Ms. Mansfield's counsel appears to have attached to this email copies of Ms.
    Mansfield's reports to HSD and the Auditor.  (*See* Jacobson Email at 1-2; Stevens Decl. ¶ 7.)  In

ORDER- 7

1    had heard about Ms. Mansfield's reports of IRB violations.  (Stevens Decl. ¶ 7.)  Ms.

2    Stevens states that counsel's email and its attachments were not relevant to her task at the

3    time because they did not pertain to whether Ms. Mansfield could restore her access to

4    VA facilities.  (*See id.* ¶ 8.)  Instead, because Ms. Mansfield provided no new information

5    on that subject, Ms. Stevens terminated Ms. Mansfield's employment for lack of access

6    to VA facilities.  (*See id.* ¶¶ 8-9, at 22.)

7          On March 10, 2013, Ms. Mansfield filed this lawsuit in King County Superior

8    Court.  (State Ct. Rec. (Dkt. # 2-1) at 5.)  Although her original complaint named only

9    Ms. Jones-Pfaff (*see id.* at 5, 7), Ms. Mansfield soon amended her complaint to include

10   the rest of the research team, Ms. Stevens, UW, and others (*see id.* at 17-27).  The case

11   was removed to this court on June 27, 2014.  (Not. of Rem. (Dkt. # 1).)  Since that time,

12   court orders and voluntary dismissals have winnowed the defendants down to two—Dr.

13   Palmer and Ms. Stevens—against whom Ms. Mansfield asserts claims under 42 U.S.C.

14   § 1983 for First Amendment retaliation.  (*See* Dkt. ## 11, 46, 56, 60, 91, 103; 3d Am.

15   Compl. ¶¶ 33-35.)  Ms. Mansfield alleges that Dr. Palmer influenced the decision to

16   terminate her and did so in retaliation for her reports of IRB violations.  (*See* Resp. at 5-

17   13, 19-25.)  In addition, Ms. Mansfield asserts that Ms. Stevens is liable for such

18   retaliation because she affirmed the termination recommendation without investigating

19   Ms. Mansfield's retaliation claims.  (*See id.* at 22-23.)

20

21

22   any event, Ms. Mansfield attests that she provided Ms. Stevens with those documents and
     discussed them with Ms. Stevens prior to being terminated.  (*See* Mansfield Decl. ¶¶ 4-4C.)

On June 29, 2015, Defendants filed the instant motion for summary judgment. (*See* Dkt. # 105; Mot.)  They make three primary arguments in support of summary judgment:  (1) that Ms. Mansfield's reports were not protected speech; (2) that Ms. Mansfield's reports were not a substantial or motivating factor in the decision to fire her; and (3) that UW would have fired Ms. Mansfield even absent her allegedly protected speech.  (*See id.* at 2.)  Defendants' motion is now before the court.

### III.    DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, then the nonmoving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658.  A fact is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

1    In determining whether the fact-finder could reasonably find in the nonmoving

2    party's favor, "the court must draw all reasonable inferences in favor of the nonmoving

3    party, and it may not make credibility determinations or weigh the evidence." *Reeves v.*

4    *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Nevertheless, the

5    nonmoving party "must do more than simply show that there is some metaphysical doubt

6    as to the material facts . . . .  Where the record taken as a whole could not lead a rational

7    trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v.*

8    *Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting *Matsushita*

9    *Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  The court may

10   only consider admissible evidence when ruling on a motion for summary judgment.  *Orr*

11   *v. Bank of Am., NT & SA*, 285 F.3d 764, 773-75 (9th Cir. 2002).  "Legal memoranda and

12   oral argument are not evidence and do not create issues of fact capable of defeating an

13   otherwise valid summary judgment."  *Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir.

14   1982); *see also Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir.

15   2003) ("Conclusory allegations unsupported by factual data cannot defeat summary

16   judgment.").

17   **B.    First Amendment Retaliation**

18       Ms. Mansfield claims that Defendants violated her First Amendment right to

19   freedom of speech by contributing to the termination of her UW employment in

20   retaliation for her reports of IRB violations.  (*See* Resp. at 5-13, 19-25; 3d Am. Compl.

21   ¶¶ 33-35.)  Although a public employer may not violate the First Amendment rights of its

22   employees, not all speech by government employees receives protection under the First

1    Amendment.  *See Garcetti v. Ceballos*, 547 U.S. 410, 417-21 (2006).  The Ninth Circuit

2    employs a five-step sequential inquiry to determine whether a public employer

3    unlawfully retaliated against an employee for engaging in protected speech.  According

4    to this approach, courts consider:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether
> the plaintiff spoke as a private citizen or public employee; (3) whether the
> plaintiff's protected speech was a substantial or motivating factor in the
> adverse employment action; (4) whether the state had an adequate
> justification for treating the employee differently from other members of
> the general public; and (5) whether the state would have taken the adverse
> employment action even absent the protected speech.

9    *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  "[B]ecause these are sequential

10   steps," failure of the employee's case at any step "necessarily concludes our inquiry."

11   *Huppert v. City of Pittsburg*, 574 F.3d 696, 703 (9th Cir. 2009), *overruled on other*

12   *grounds by Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013).  The plaintiff bears the

13   burden to satisfy steps one through three, but the burden shifts to the defendant at steps

14   four and five.  *Eng*, 552 F.3d at 1070-72.  Here, Defendants' motion addresses only steps

15   two, three, and five.  (Mot. at 16.)

16       1.   <u>Whether Ms. Mansfield spoke as a public employee or a private citizen</u>

17           Defendants first contend that there is no genuine dispute that Ms. Mansfield spoke

18   as a public employee, not as a private citizen, in making her reports to HSD.  (*See id.* at

19   16-20; Reply at 2-9.)  The court agrees.  "'Statements are made in the speaker's capacity

20   as citizen if the speaker had no official duty to make the questioned statements, or if the

21   speech was not the product of performing the tasks the employee was paid to perform.'"

22   *Anthoine v. N. Cent. Ctys. Consortium*, 605 F.3d 740, 749 (9th Cir. 2010) (quoting *Eng*,

ORDER- 11

1    552 F.3d at 1071).  On the other hand, "speech which 'owes its existence to an

2    employee's professional responsibilities' is not protected by the First Amendment."

3    *Huppert*, 574 F.3d at 704 (quoting *Ceballos*, 547 U.S. at 421).  This "inquiry into the

4    protected status of speech presents a mixed question of fact and law."  *Posey v. Lake*

5    *Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1130 (9th Cir. 2008).

6          To resolve this mixed question of fact and law, two inquiries are necessary.

7    *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011) (citing *Posey*,

8    546 F.3d at 1129).  "First, a factual determination must be made as to the 'scope and

9    content' of a plaintiff's job responsibilities.'"  *Id.* (citing *Eng*, 552 F.3d at 1071).  This

10   inquiry "is a practical one.  Formal job descriptions often bear little resemblance to the

11   duties an employee actually is expected to perform, and the listing of a given task in an

12   employee's written job description is neither necessary nor sufficient to demonstrate that

13   conducting the task is within the scope of the employee's professional duties for First

14   Amendment purposes."  *Garcetti*, 547 U.S. at 424-25; *see also Johnson*, 658 F.3d at 966.

15   "Second, the 'ultimate constitutional significance' of those facts must be determined as a

16   matter of law."  *Johnson*, 658 F.3d at 966 (quoting *Eng*, 552 F.3d at 1071).

17          Here, no genuine dispute exists regarding the scope and content of Ms.

18   Mansfield's job responsibilities.  *See id.*  Ms. Mansfield's deposition testimony shows

19   that her job responsibilities included reporting IRB violations to her supervisor and, if her

20   supervisor's response was inadequate, to HSD:

21          Q:   [W]as one of your job duties to ensure compliance with applicable
             protocols?
22

ORDER- 12

A:  Yes, the mission of a [UW] Health and Human Services registered nurse . . . are those duties.

Q:  Including IRB protocols.  Part of your job was to ensure compliance with those?

A:  Correct.

Q:  Do you believe that you had a duty to report any IRB protocol violations?

A:  Yes.

Q:  And that was part of your job responsibilities?

A:  Correct.

. . .

Q:  So if you weren't satisfied with the response you received by a supervisor, was it your obligation to report that to, for example, [HSD]?

A:  My duties as a registered nurse are patient safety, patient privacy, validity of study outcome, and the ethical treatment.  So, yes, if I report it to my direct supervisor -- it was also my duty as an employee of [UW] to make sure that they're aware . . . .

Q:  So part of your job, from your perspective, was to report IRB protocol violations to [HSD]?

A:  My chain of command was to report it to the principal investigator, and then if I had questions, the IRB is a resource for the University and you could contact them for questions as well.  So, yes, in adherence to policies, I used those departments.

Q:  Was one of your responsibilities?

A:  Yes, one of my responsibilities.

(*See* Mansfield Dep. at 44:14-46:4 *see also id.* at 116:11-16 ("A: [I]f I'm going to be responsible and this is considered an IRB violation, it's my job to notify the UW that this

ORDER- 13

1    occurred.  Q: You were just doing your job, is that right, in reporting this IRB violation?

2    A: Correct . . . ."), 167:12-14, 167:20-24.)

3         The testimony of HSD's Director, Karen Moe, confirms this point (*see* Moe Decl.

4    ¶ 5 ("[I]t is the responsibility and duty of each and every University employee who works

5    on or is involved with human studies research to report any ethical concern, non-

6    compliance, or other problem concerning University research with human participants.

7    University employees who become aware of such concerns are required to report them to

8    their supervisor and/or the lead researcher and if unsatisfied with his/her response, report

9    such concerns to HSD or other appropriate UW office.  This was true in 2010 and 2011

10   and remains true today."), as does the testimony of the Assistant Director for Quality and

11   Compliance at HSD, Wendy Brown (Brown Decl. ¶ 4), and the testimony of UW

12   Department of Medicine Director Donna Devine (*see* Devine Dep. at 37:2-6; Stevens

13   Decl. ¶ 4; Resp. at 13).

14        Additional confirmation comes from remarks that Ms. Mansfield made around the

15   time she was reporting alleged IRB violations to HSD.  For instance, in a December 16,

16   2010, email to UW Department of Medicine HR Director Ron Boerger, Ms. Mansfield

17   wrote, "Contacting the IRB when violations occur is within my job description because I

18   am a supervisor and as a nurse, a patient advocate."  (Jacobson Decl. App'x 7 at 1; *see*

19   Boerger Decl. (Dkt. # 81) ¶ 2.)  Similarly, in a July 22, 2011, email to Ms. Brown, Ms.

20   Mansfield explained that in reporting on research improprieties, she "was simply trying

21   to do my job."  (Brown Decl. ¶ 9, at 11.)  The most colorful example of Ms. Mansfield

22   describing her job duties, however, comes from the email that her counsel sent to Ms.

Stevens just before Ms. Stevens was to meet with Ms. Mansfield to discuss the

termination recommendation.  In that email, Ms. Mansfield's counsel describes Ms.

Mansfield as a "patient safety compliance officer" and "Veterans Admin protocol

officer" who "was in charge of patient safety" and made multiple IRB reports.  (Jacobson

Email at 2.)  The email continues, "This placed Mansfield in the uncomfortable but

*assigned position* of reporting safety and health and protocol violations by Jones Pfaff

and her buddies in the lab, all of whom were under Mansfield's jurisdiction as

compliance officer."  (*Id.* (emphasis added).)

Ms. Mansfield now attempts to distance herself from her previous testimony and

remarks.  (*See* Resp. at 3-4; Mansfield Decl.  ¶¶ 1, 1C.)  To that end, she has submitted a

declaration in which she indicates that her nursing license required her to report the

research team's alleged IRB violations but states that her job with UW "required far

less."  (Mansfield Decl. ¶ 1; *see* Resp. at 3.)  She also states that her aim in reporting

"was to implement the US HHS regulations" related to IRBs.  (Mansfield Decl. ¶ 1C.)

She emphasizes that her "printed job description" did not require her to make reports to

anyone beyond her supervisor (*see id.* ¶ 1; *see also* Mansfield Dep. at 480:1-2), and she

claims that Dr. Palmer never instructed her to do so (Mansfield Decl. ¶ 1).[7]

In light of her previous admissions, Ms. Mansfield's declaration is insufficient to

create a genuine dispute regarding whether her job required her to report IRB violations

---

[7] (*But see* Berntsen Decl. ¶ 13, at 99 ("Mansfield 11/8/10 email") (relating that a subordinate of Ms. Mansfield's has violated IRB rules and regulations, that Ms. Mansfield informed her supervisors of this, and that her supervisors "directed me [Ms. Mansfield] to go up the chain of command").)

to HSD.  *See Scott*, 550 U.S. at 380; *Johnson*, 658 F.3d at 966.  To begin, much of Ms.

Mansfield's declaration does not undermine her earlier statements that her job required

her to make such reports.  For example, that a professional license requires particular

conduct is not inconsistent with a job requiring the same conduct.  (*See* Mansfield Decl.

¶ 1; Resp. at 3); *Cicchiello v. Beard*, 726 F. Supp. 2d 522, 530 (M.D. Pa. 2010)

("Plaintiff does not dispute that as part of both her job duties as well as her nurse

licensing requirements, it was her responsibility to report nursing violations to her

employer.").  Nor is the absence of an explicit requirement in a written job description

necessarily inconsistent with the existence of such a requirement.  *See Garcetti*, 547 U.S.

424-25 ("Formal job descriptions often bear little resemblance to the duties an employee

actually is expected to perform, and the listing of a given task in an employee's written

job description is neither necessary nor sufficient to demonstrate that conducting the task

is within the scope of the employee's professional duties for First Amendment

purposes."); *see also Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d

196, 202-03 (2d Cir. 2010) ("[S]peech that government employers have not expressly

required may still be 'pursuant to official duties,' so long as the speech is in furtherance

of such duties.") (citing *Freitag v. Ayers*, 468 F.3d 528, 546 (9th Cir. 2006)); (Job

Description at 1 (listing among the incumbent's responsibilities "ensuring . . . adherence

to study protocol").)

        Furthermore, the court does not consider Ms. Mansfield's declaration to the extent

it contradicts her earlier testimony.  "The general rule in the Ninth Circuit is that a party

cannot create an issue of fact by an affidavit contradicting his prior deposition

1    testimony." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).  To

2    apply this rule, the court must first "make a factual determination that the contradiction

3    was actually a 'sham.'" *Id.*  Second, "the inconsistency between a party's deposition

4    testimony and subsequent affidavit must be clear and unambiguous . . . ." *Id.* at 998-99.

5    Therefore, the "non-moving party is not precluded from elaborating upon, explaining or

6    clarifying prior testimony elicited by opposing counsel on deposition and minor

7    inconsistencies that result from an honest discrepancy, a mistake, or newly discovered

8    evidence afford no basis for excluding an opposition affidavit." *Id.* (internal punctuation

9    omitted) (quoting *Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995)).

10        The court finds that Ms. Mansfield's declaration constitutes a sham insofar as it

11   implies that her job at UW did not require her to report IRB violations to anyone but Dr.

12   Palmer.  In paragraph one of her declaration, Ms. Mansfield describes her independent

13   duty as a nurse to look out for patient safety.  (Mansfield Decl. ¶ 1.)  She then states that

14   her UW assignment required "far less" of her, and that neither her written job description

15   nor her instructions from Dr. Palmer required her to report patient-safety issues.  (*Id.*)

16   The implication of this paragraph is that her position at UW did not require her to report

17   IRB violations to anyone beyond Dr. Palmer.  (*See id.*; *see also id.* ¶ 1C; Resp. at 3.)

18   This is not a minor inconsistency or clarifying information.  Rather Ms. Mansfield states

19   in her deposition that reporting to HSD was her "duty as an employee of [UW]"

20   (Mansfield Dep. at 44:22-45:18), and then implies in her declaration that her job at UW

21   imposed no obligation to make such reports (*see* Mansfield Decl. ¶ 1; *see also id.* ¶ 1C;

22   Resp. at 3).  The distinction between the two is clear and unambiguous.  *See VanAsdale*,

1   577 F.3d at 998-99.  Ms. Mansfield's declaration, however, offers no explanation as to

2   why she has changed her story.[8]  (*See* Mansfield Decl.)  Moreover, the remainder of the

3   record, including Ms. Mansfield's statements from 2010 and 2011, supports her

4   deposition testimony.[9]

5        The court therefore concludes that no genuine dispute exists regarding the scope

6   and content of Ms. Mansfield's job duties.  *See Johnson*, 658 F.3d at 966.  On the record

7   before the court, no reasonable jury could find that Ms. Mansfield's job duties did not

8   include reporting IRB violations to HSD.  *See Scott*, 550 U.S. at 380; *Galen*, 477 F.3d at

9   658; *VanAsdale*, 577 F.3d at 998-99.

10       Next, the court considers the legal question of whether Ms. Mansfield made the

11  reports at issue here pursuant to her job duties.  *See Johnson*, 658 F.3d at 966.  The court

12  answers that question in the affirmative and therefore concludes that Ms. Mansfield's

13  reports to HSD receive no protection under the First Amendment.  *See Huppert*, 574 F.3d

14  ――――――――――――――

15      [8] Ms. Mansfield's opposition brief suggests that Ms. Mansfield was referring to her
    licensing obligations when she seemed to be talking about her job at UW.  (Resp. at 3

16  ("Mansfield used the words 'job' and 'responsibility' Mansfield [sic] when discussing her
    'mission' and RN licensing obligations.  But Mansfield viewed her assigned UW duties
    differently than she viewed her responsibilities.").)  Yet Ms. Mansfield does not state in her

17  declaration that she misspoke during her deposition.  *See Estrella*, 682 F.2d at 819-20 ("Legal
    memoranda and oral argument are not evidence and do not create issues of fact capable of

18  defeating an otherwise valid summary judgment.").  Moreover, neither her brief nor her
    declaration even attempts to explain her use of the phrase "duty as an employee of the University

19  of Washington" in connection with her reporting to HSD.  (Mansfield Dep. at 44:22-45:18; *see*
    Resp.; Mansfield Decl.)

20
        [9] Although Ms. Mansfield specifically singles out as disputed one aspect of the

21  declaration of Ms. Moe, Ms. Mansfield does not challenge Ms. Moe's and Ms. Brown's
    assertions that all UW employees involved with human subjects research have a duty to report

22  concerns to their supervisors and, if the response proves inadequate, to HSD or another
    appropriate UW office.  (*See* Moe Decl. ¶ 5; Brown Decl. ¶ 4; Resp.)

1    at 703, *overruled on other grounds by Dahlia*, 735 F.3d 1060.  Ms. Mansfield did not

2    speak as a private citizen when she reported her concerns to HSD.  Rather she wrote

3    emails from her work address, largely during work hours, and to another division of UW

4    that oversees studies of the kind with which she was involved and in which she had a

5    leadership role.  (*See* 1st Report; 2d Reports; Moe Decl. ¶¶ 3-5; Job Description at 1-2;

6    Jacobson Email at 2); *Freitag*, 468 F.3d at 546 (concluding that a prison guard's report to

7    the director of the state department of corrections regarding inmate misconduct and

8    failure of superiors to respond was submitted "pursuant to [plaintiff's] official duties" and

9    thus not constitutionally protected); *Coomes v. Edmonds Sch. Dist. No. 15*, No. C12-

10   0319-JCC, 2013 WL 3294393, at *5-6 (W.D. Wash. June 28, 2013) (holding that

11   plaintiff-teacher spoke pursuant to her official duties in communications to school and

12   district administrators because she used her school email account, sent a number of

13   communications during school hours, and "was expressing her professional opinions

14   about the appropriate management of a program in which she played a leadership role").

15   Further, as detailed above, Ms. Mansfield admits that she had a duty as a UW employee

16   to make such reports and that she made reports as part of her job.  (*See* Mansfield Dep. at

17   44:14-46:4; *see also id.* at 116:11-16, 167:12-14, 167:20-24; Jacobson Decl. App'x 7 at

18   1; Brown Decl. ¶ 9, at 11; Jacobson Email at 2.)

19        Ms. Mansfield argues that she spoke as a private citizen because she reported to an

20   organization "outside the UW chain of command" and because her nursing license

21   obligated her to act as she did.  (*See* Resp. at 3-4; 15-17.)  Regarding the first argument,

22   the record contains no support for Ms. Mansfield's conclusory assertion she reported

1  "outside [her] UW chain of command." (Resp. at 17-18.)  Rather, uncontested statements

2  in the declarations of Ms. Moe and Ms. Brown show that HSD is a division of UW that

3  oversees UW research involving human subjects and receives compulsory complaints and

4  reports about such research.  (*See* Moe Decl. ¶¶ 3-5; Brown ¶¶ 3-4.)  Furthermore, Ms.

5  Mansfield herself has characterized HSD as part of her chain of command.  (Mansfield

6  Dep. at 45:11-46:4 ("Q: So if you weren't satisfied with the response you received by a

7  supervisor, was it your obligation to report that to, for example, [HSD]?  Q: . . . .  So, yes,

8  if I report it to my direct supervisor – it was also my duty as an employee of [UW] to

9  make sure that they're aware . . . .  Q: So part of your job, from your perspective, was to

10  report IRB protocol violations to [HSD]?  A: My chain of command is to report it to the

11  principal investigator, and then if I had questions, the IRB is a resource for the University

12  and you could contact them as well.  So, yes, in adherence to policies, I used those

13  departments.  Q:  Was one of your responsibilities?  A:  Yes.").)[10]

14       Ms. Mansfield's second argument fares no better.  Although the record indicates

15  that Ms. Mansfield spoke not just as a UW employee but also as a nurse (*see* Mansfield

16  Dep. at 167:11-168:4, 418:10-17; Mansfield Decl. ¶ 1), her additional motivation does

17  not detract from the conclusion that she spoke as a public employee.  *See Garcetti*, 547

18  U.S. at 421 ("It is immaterial whether [the plaintiff] experienced some personal

19

20       [10] In addition, whether a report is made outside the employee's chain of command is a
21  relevant but not dispositive consideration.  *See Dahlia*, 735 F.3d at 1074.  This consideration is
   particularly relevant in "a highly hierarchical employment setting such as law enforcement," *id.*;
22  however, Ms. Mansfield has presented no evidence or argument that she worked in such a
   setting.

ORDER- 20

1    gratification from writing the memo; . . . .  The significant point is that the memo was

2    written pursuant to [the plaintiff's] official duties."); *Cicchiello*, 726 F. Supp. 2d at 530

3    ("Plaintiff does not dispute that as part of both her job duties as well as her nurse

4    licensing requirements, it was her responsibility to report nursing violations to her

5    employer.  Because Plaintiff' expressions were made in her capacity as a registered

6    nurse, her speech . . . does not enjoy First Amendment protection."); (*see also* Job

7    Description at 2 (requiring the incumbent to possess a valid nursing license).)

8    Accordingly, the court concludes that Ms. Mansfield reported to HSD in her capacity as a

9    public employee.  *See Johnson*, 658 F.3d at 966; *Freitag*, 468 F.3d at 546.

10            Ms. Mansfield's reports to the Auditor, however, are another matter.  As noted

11   above, Ms. Mansfield made a preliminary report to the Auditor on February 5, 2011, and

12   a more detailed report on April 24, 2011.  (*See* 1st Auditor Report; 2d Auditor Report.)

13   The "right to complain . . . to an independent state agency is guaranteed to any citizen in

14   a democratic society regardless of his status as a public employee."  *Freitag*, 468 F.3d at

15   545 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  Moreover, Defendants

16   do not appear to contest that Ms. Mansfield had no official duty to report her concerns to

17   the Auditor (*see* Reply at 2-10), and nothing in the record indicates that she had such a

18   duty.  The court therefore finds that Ms. Mansfield spoke as a private citizen when she

19   made her reports to the Auditor.  *See Freitag*, 468 F.3d at 545.

20

21

22

1   2. <u>Whether Ms. Mansfield's speech was a substantial or motivating factor in her termination</u>

2

3   Nevertheless, Ms. Mansfield's retaliation claim fails because she cannot show that

4 her reports to the Auditor were "a substantial or motivating factor in the adverse

5 employment action." *Eng*, 552 F.3d at 1071.  "As a threshold matter, to establish a

6 genuine and material dispute as to whether the speech was a substantial or motivating

7 factor in the adverse action, the plaintiff must first provide evidence indicating that the

8 defendant was aware of the plaintiff's expressive conduct." *Marr v. Anderson*, 611 F.

9 Supp. 2d 1130, 1142 (D. Nev. 2009) (citing *Alpha Energy Savers v. Hansen*, 381 F.3d

10 917, 929 (9th Cir. 2004)); *see also Keyser v. Sacramento City Unified Sch. Dist.*, 265

11 F.3d 741, 750-51 (9th Cir. 2001); *Rohrbough v. Univ. of Col. Hosp. Auth.*, 596 F.3d 741,

12 750 (10th Cir. 2010).

13   Ms. Mansfield points to no evidence showing that Dr. Palmer knew about her

14 reports to the Auditor.  *See id.*  Dr. Palmer denies knowing of those reports during the

15 relevant time period.  (*See* Palmer Decl. ¶¶ 28-29.)  In the face of that denial, Ms.

16 Mansfield offers her declaration, in which she claims that Dr. Palmer "knew the process

17 [with the Auditor] had started."  (Mansfield Decl. ¶ 1F.)  Her only evidence in support of

18 this claim, however, is a pair of emails that do not show that Dr. Palmer knew about her

19 reports to the Auditor.  The first email is a December 16, 2010, communication from Ms.

20 Mansfield to Mr. Boerger, in which she states, "I am a . . . whistleblower.  On 11/4/10, I

21 informed Dr. Palmer . . . of IRB violations made by Dawn Jones Pfaff. . . . When Dr.

22 Palmer did not report the violations to the IRB, I contacted Wendy Brown . . . ."

ORDER- 22

1    (Jacobson Decl. App'x 7 at 1.)  The second is a March 7, 2011, email from Mr. Boerger

2    to Dr. Palmer, wherein Mr. Boerger references his mid-December exchange with Ms.

3    Mansfield and explains that "Ms. Mansfield indicated her intent to contact the UW

4    Ombudsman's office."  (*Id.* App'x 52 at 2.)

5          Nothing in these emails suggests that Dr. Palmer knew about Ms. Mansfield's

6    reports to the Auditor.  In fact, no mention of the Auditor appears in either email.  (*See*

7    Jacobson Decl. App'x 7, 52.)  Ms. Mansfield refers to herself as a "whistleblower" in the

8    first email; however, she connects that statement to her reports to Dr. Palmer and HSD,

9    not to the Auditor.  (*See id.* App'x 7.)  Indeed, she sent the first email two months before

10   filing her first report with the Auditor.  (*See id.*; 1st Auditor Report.)  In the second email,

11   Mr. Boerger does not use the word "whistleblower" and states only that Ms. Mansfield

12   intended to contact another UW office, not the Auditor.[11]  (*See* Jacobson Decl. App'x

13   52.)  Ms. Mansfield did not file her second report with the Auditor until more than a

14   month after Mr. Boerger's email to Dr. Palmer.  (*See id.*; 2d Auditor Report.)  Thus,

15   because Ms. Mansfield offers no evidence to show that Dr. Palmer knew of her reports to

16   the Auditor,[12] her claim against Dr. Palmer must fail.  *See Marr*, 611 F. Supp. 2d at 1142

17   (citing *Alpha Energy Savers*, 381 F.3d at 929); *see also Keyser*, 265 F.3d at 750-51;

18   *Rohrbough*, 596 F.3d at 750.

19

20          [11] Ms. Mansfield points to no evidence that she ever contacted the UW Ombudsman, or

21   that Dr. Palmer took action against her because she intended to do so.

22          [12] The court STRIKES Ms. Mansfield's statements regarding Dr. Palmer's knowledge of
     her reports to the Auditor for lack of foundation.  *See* Fed. R. Evid. 602; (Mansfield Decl. ¶ 1F.)

1    3.  Whether Ms. Stevens may be liable on a theory of imputed retaliation

2    Ms. Mansfield's claim against Ms. Stevens likewise cannot survive.  That claim

3    relies on the theory that Dr. Palmer's retaliation should be imputed to Ms. Stevens

4    because Ms. Stevens was legally required to investigate Dr. Palmer's alleged retaliation

5    before terminating Ms. Mansfield but failed to do so.[13]  (*See* Resp. at 22-23 (citing

6    *Poland v. Chertoff*, 494 F.3d 1174, 1182-83 (9th Cir. 2007); *Johnson v. Duffy*, 588 F.2d

7    740, 743-44 (9th Cir. 1978)).)  The foregoing analysis and conclusions foreclose imputed

8    liability here.  A plaintiff may impute retaliation to a superior only if the plaintiff first

9    demonstrates underlying intentional retaliation by a subordinate.  *See Marr*, 611 F. Supp.

10   2d at 1145-46 (citing *Poland*, 494 F.3d at 1182).  As discussed above, however, Ms.

11   Mansfield fails to show that Dr. Palmer intentionally retaliated against her.  *See supra*

12   Parts III.B.1-2.  Accordingly, no liability exists to impute to Ms. Stevens, and so the

13   claim against Ms. Stevens must fail.  *See Marr*, 611 F. Supp. 2d at 1145-46 (citing

14   *Poland*, 494 F.3d at 1182).

15   In sum, no genuine dispute of material fact exists and Defendants are entitled to

16   judgment as a matter of law on three bases:  (1) Ms. Mansfield spoke as a public

17   employee when she reported alleged IRB violations to HSD; (2) Dr. Palmer did not know

18   about Ms. Mansfield's reports to the Auditor during the relevant time period; and (3) Ms.

19

20   _____

21   [13] Ms. Mansfield does not contest Defendants' assertion that Ms. Stevens did not
     intentionally retaliate against Ms. Mansfield.  (*See* Resp. at 22-23; *see also* Resp.)  Thus, the
     court agrees with Defendants that there is no genuine dispute that Ms. Stevens did not

22   intentionally retaliate against Ms. Mansfield.  *See* Fed. R. Civ. P. 56(c), (e); *Galen*, 477 F.3d at
     658; (Mot. at 24-25; Reply at 12-13.)

1    Stevens cannot be liable under a theory of imputed retaliation because Ms. Mansfield

2    fails to show underlying intentional retaliation.  The court therefore grants summary

3    judgment on Ms. Mansfield's First Amendment claims against Dr. Palmer and Ms.

4    Stevens.  Finally, given that these claims are Ms. Mansfield's sole remaining claims, the

5    court dismisses this case with prejudice.

6                            **IV.    CONCLUSION**

7            For the foregoing reasons, the court GRANTS Defendants' motion for summary

8    judgment (Dkt. ## 105, 113-1) and DISMISSES this case WITH PREJUDICE.

9            Dated this 1st day of September, 2015.

10

11

12                                             _____

13                                             JAMES L. ROBART
                                               United States District Judge

14

15

16

17

18

19

20

21

22